UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

CHANISE COYNE,

Defendant.
_________________________________/

Case No. 2:26-cr-20082

Hon. David M. Lawson

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant Chanise Coyne, by and through her counsel, Clark Hill PLC, respectfully submits this Sentencing Memorandum to assist the Court in determining a just sentence. For the reasons set forth below, Mrs. Coyne recommends a custodial sentence no higher than the lower third of the guidelines range and restitution in the amount of $4,669,962.76.

**1. Procedural Background**

On February 26, 2026, Mrs. Coyne was arraigned on a 12-count Indictment [ECF No. 1] involving seven counts of wire fraud, contrary to 18 U.S.C. § 1343, and eight counts of money laundering, contrary to 18 U.S.C. § 1957. On May 14, 2026, the government and Mrs. Coyne reached an agreement pursuant to Fed. R. Crim. P. 11. The terms of the agreement include Mrs. Coyne pleading guilty to count 7 of the Indictment - wire fraud. Among other terms, the agreement sets restitution at $4,669,962,76.

On May 19, 2026, the parties filed the Rule 11 Plea Agreement [ECF No. 25] and the Court conducted a plea hearing. Sentencing is now scheduled for September 22, 2026.

**2. Factual Background**

The Presentence Investigation Report and the Rule 11 Plea Agreement each contain an adequate amount of information to assist the Court at sentencing. Mrs. Coyne would like to highlight some of that information and provide additional contextual analysis for the Court to consider.

Preliminarily, Mrs. Coyne's attempt to assist the Court is in no way an effort to distance herself from the crime she committed. Mrs. Coyne is guilty of wire fraud. She did fraudulently induce the victim to provide millions of dollars to her to support, in near totality, her massive daily online gambling.

As noted in the Presentence Report, what began as a distraction from the monotony of the COVID-19 pandemic later morphed into a scheme to lie, cheat and steal from an unsuspecting victim. Mrs. Coyne's almost $200,000 windfall in May of 2023 from low-stakes betting with an online slot machine application began a rapid spiral into massive gambling wagers backed by money supplied by the victim.[1]

---

[1] Twain observed that "[a] dollar picked up in the road is more satisfaction to you than ninety-and-nine which you had to work for, money won at faro or in stocks snuggles into your heart in the same way." Mark Twain, *At the Shrine of St. Wagner*, *in What is Man and Other Essays* 209, 219 (1917).

Lured by the promise of VIP status from the online gambling app and prior to her criminal conduct, in just a few months Mrs. Coyne quickly spent all the winnings. But she had already told her husband of the initial windfall. She even cashed out the windfall and deposited the money in her bank account. She could have stopped. She could have enjoyed her good fortune, but she didn't. The money was gone; Mrs. Coyne panicked.

Mrs. Coyne already had a business relationship with the victim. For several months she provided legitimate photography services for the victim's middle school aged daughter. The victim and his wife long maintained a strong interest in getting their daughter into the world of modeling. Mrs. Coyne took advantage of their desire. With the winnings gone, Mrs. Coyne began her criminal scheme to wishfully replenish her bank account. Knowing that the victim and his wife were very eager to see their young daughter move through the modeling ranks, Mrs. Coyne began pitching them cross-country modeling ventures. The only catch was the victim had to prepay the expenses. Mrs. Coyne "offered" to receive the money from the victim and then forward the funds on to the promoter of the event. The victim agreed. Over the course of the next fourteen months, Mrs. Coyne tricked the victim and his wife into giving her over $4.6 million. Mrs. Coyne never delivered on any promise to get the victim's daughter into any nationally recognized modeling venture. The money she received was gambled away. Mrs. Coyne's bank records show that as money

was received from the victim, she near immediately spent each deposit on online gambling sites. Mrs. Coyne exclusively played high wager slot machine games at these sites. As outlandish as it sounds, Mrs. Coyne's goal was to win back the money originally won and later return the money she received from the victim. Her plan crumbled.

Mrs. Coyne's efforts to create the ruse included creating one fictitious email address. That address was used by Mrs. Coyne to create a persona held out to be her contact in the modeling world who would provide the opportunities for the victim's daughter so long as the victim paid the fees requested. The victim did not know that it was Mrs. Coyne who was drafting the emails explaining the "events" and then directing the victim to pay the fees requested directly to Mrs. Coyne. Mrs. Coyne also drafted text messages that she claimed were from other contacts in the child modeling world. Mrs. Coyne would simply type the message into a text and send it to the victim saying she received that text from a vendor, photographer, stylist, wardrobe provider, or another person in the larger modeling industry. These messages were created by Mrs. Coyne to induce the victim into sending her money. Mrs. Coyne also created "invoices" from vendors such as Nike and American Girl to further enhance the scheme that she was forwarding the victim's money to bona fide industry participants. Mrs. Coyne created these false documents by using a laptop computer and commonly used software programs.

Throughout the life of her criminal scheme, Mrs. Coyne never created fictitious companies. She did not open bank accounts for the purpose of receiving the victim's money. She did not create websites to further the illusion of the modeling events. She did not set up separate phone numbers to trick the victim into thinking she was working directly with vendors or other modeling professionals. Mrs. Coyne perpetrated this crime by manipulating the desires of the victim. She was able to perfect her scheme with minimal technological enhancements.

**3. The Sentencing Guidelines**

**a. The Offense Level Calculation**

As stated in the Rule 11 agreement, the parties agree on all but one facet of the calculation of the guidelines. The parties agree to the application of the following sections:

| **Guideline Section** | **Description** |
|---|---|
| U.S.S.G. § 2B1.1(a)(1) | Base Offense Level: 7 |
| U.S.S.G. § 2B1.1(b)(1)(J) | Loss of More than $3,500,000 and less than $9,500,000: +18 |
| U.S.S.G. § 2B1.1(b)(2)(A)(iii) | Substantial financial hardship to one or more victims: +2 |
| U.S.S.G. § 3E1.1(a) | Acceptance of responsibility: -2 |
| U.S.S.G. § 3E1.1(b) | Additional reduction for acceptance of responsibility: -1 |

In total, the parties agree that Mrs. Coyne's conduct equates to an offense level score of at least 24. The unresolved offense level calculation is found at U.S.S.G. §



100028\1000289\289119044

2B1.1(b)(10)(C) – whether Mrs. Coyne used sophisticated means to commit the wire fraud.

**i. The sophisticated means enhancement should not be applied.**

The Probation Department and the Government each contend that U.S.S.G. § 2B1.1(b)(10)(C) should be applied in this case. This two-level enhancement is applied when the offense involves sophisticated means. Sophisticated means are "*especially* complex or *especially* intricate offense conduct pertaining to the execution or concealment of the offense." *United States v. Yousef*, 170 F.4th 498, 508 (6th Cir. 2026) (quoting USSG §2B1.1 cmt. n.9(B)) (Emphasis added). The Commentary notes, by way of example,

> [I]n a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means. [USSG §2B1.1 cmt. n.9(B).]

In determining whether a defendant's execution of her scheme was especially complex or especially intricate, the sentencing court must look at the totality of the circumstances. *United States v Chappelle*, 78 F.4th 854, 862 (6th Cir. 2023). In *Chappelle*, a tax evasion case, the defendant created several business entities to support a pyramid scheme, used complex routes to divert money from his business accounts to his personal accounts, and made numerous false statements to the IRS.

*Id.* This conduct supported the application of the sophisticated means enhancement. *Id.* In another Sixth Circuit case, a defendant knowingly shipped stolen cell phones not only around the country, but also to overseas markets in the Middle East and Hong Kong. He had unique knowledge of these black markets dealing in high-end portable electronics. In furtherance of his scheme, he applied specialized knowledge in "cleaning" the stolen phones so they could be operational regardless of any manufacturer's efforts to deactivate the phones. The Court concluded that he possessed and used an expertise well beyond that of a typical black-market dealer thus justifying the sophisticated means enhancement. *United States v Yousef*, 170 F.4th 498, 508 (6th Cir. 2026). Another case highlights the application of the sophisticated means enhancement where a defendant in a healthcare fraud scheme falsified patient records, forged prescriptions, and created fraudulent business records in an effort to avoid detection. *United States v Hamaed*, 178 F.4th 281, 304 (6th Cir. 2026).

The Government points to Mrs. Coyne's use of a fictitious email to bolster the justification for the sophisticated means enhancement. The Sixth Circuit Court of Appeals has given some direction on how much weight the sentencing court should give to the use of a fictitious email address. See *United States v Igboba*, 964 F.3d. 501, 512 (6th Cir. 2020). In *Igboba*, the defendant created multiple fictitious email addresses in support of a scheme to defraud. Along with the fictitious email

addresses, the defendant used the dark web, a VPN to further conceal his identity, and multiple bank accounts. *Id.*, at 511. The Court noted that, "[c]reation of new email addresses alone may not be sufficient to show sophisticated means. . ." *Id.*, at 512. The Court highlighted that those several email addresses were used in conjunction with other complexities independently justifying the enhancement. *Id.*

In the instant case, Mrs. Coyne used one fictitious email address, a handful of text messages she created and represented to be from vendors, and phony invoices she created to move her scheme to defraud forward. She did not create shell companies or phony websites. She did not move money through various business or even personal bank accounts to shield her ultimate use of the money. She did not use multiple phone lines or "burner phones" to hide her true intentions from the victim. In short, there is nothing especially complex or especially intricate about her scheme. As devastating as the loss certainly is for the victim and his family, the methodology employed by Mrs. Coyne was nothing out of the ordinary requiring no specialized knowledge or application.

For the above stated reasons, Mrs. Coyne respectfully asks the Court to score her total offense level at 24.

**b. The Criminal History Calculation**

Mrs. Coyne does not have a criminal history. She agrees that her criminal history score should be 0.

**c. The Sentencing Guidelines Range**

If the Court accepts Mrs. Coyne's recommendation, the sentencing guidelines range is 51-63 months incarceration.

**4. Sentencing Factors Under 18 U.S.C. § 3553(a)**

**a. The Nature and Circumstances of the Offense and History and Characteristics of the Defendant. 18 U.S.C. § 3553(a)(1).**

**i. The Nature and Circumstances of the Offense**

As detailed above, Mrs. Coyne fraudulently induced the victim over approximately fourteen months to deliver over $4 million. Pursuant to the Rule 11 Plea Agreement, the agreed upon loss is $4,669,962.76.

**ii. The History and Characteristics of Mrs. Coyne**

Mrs. Coyne met with the U.S. Probation Department and provided a detailed statement that is fairly represented in the PSR. The following paragraphs in this memorandum are meant to amplify, not substitute, the words of Mrs. Coyne.

Michael Coyne, Mrs. Coyne's husband, has provided a letter which is attached hereto as Exhibit 1. Mr. and Mrs. Coyne have been married since 2011. They have two school-aged children. Mr. Coyne notes, "She is incredibly supportive. When someone she loves is going through a difficult time, she doesn't hesitate to be there for them. She listens, encourages, reassures, and does whatever she can to make things a little easier. She has a way of making people feel like they are not facing things alone." Exhibit 1. Mr. Coyne concludes, "My wife is a loving wife, a

wonderful mother, a supportive friend, and a genuinely good person. I feel incredibility fortunate to know her, to share my life with her, and to watch the positive impact she has on the people around her." Exhibit 1.

Mrs. Coyne's mother and stepfather have provided a letter attached hereto as Exhibit 2. Mr. and Mrs. Cerda, in part, note, "[S]he always gives her time, patience and kindness to make people feel comfortable and welcomed[.]" Exhibit 2.

Mrs. Coyne's son, Nolan, has provided a letter for the Court's consideration and it is attached hereto as Exhibit 3. Nolan states in part, ". . . She always loves us know matter what we did. [s]he taught how to keep our self positive no matter what we're going through. [t]hat's why I love my mother so much." Exhibit 3.

Mrs. Coyne's daughter, Paityn, has provided a letter and it is attached hereto as Exhibit 4. Paityn states in part, "My mom is the most unselfish person you'll ever meet. She puts everyone and everything before herself. . . She has so many positive values and that inspires me to be just like her." Exhibit 4.

Nicole Prinzevski, Mrs. Coyne's cousin, has provided a letter for the Court's consideration attached hereto as Exhibit 5. Ms. Prinzevski states, "Chanise is a kind, caring, and compassionate person who has always had a strong love for her family. As her cousin, I have had the opportunity to see her not only as a family member but also as a mother, and I can honestly say that being a mother is one of the most important parts of who she is." Exhibit 5.

There are many other people who have written letters of support for Mrs. Coyne. The reoccurring theme in all of those letters, as represented in the letters included in this memorandum, is that Mrs. Coyne has consistently shown a genuine regard for the people in her life – family, friend, and stranger alike. Her lifelong desire to care for people stands in stark contrast to the criminal conduct she has admitted to. There is no justification for her criminal conduct. But perhaps her criminal conduct is truly aberrant from her true self. Mrs. Coyne asks that the Court take into consideration the words of the people who know her the best when formulating a just sentence.

**b. To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense, 18 U.S.C. § 3553(a)(2)(A).**

Mrs. Coyne does not hide from her criminal wrongdoing. She perpetrated a crime that was devastating to the victim and his family. As a first-time offender, with the obligation of a large restitution commitment, a minimal prison sentence will best provide a just punishment while reflecting the seriousness of the offense and respect for the law.

**c. To Afford Adequate Deterrence to Criminal Conduct. 18 U.S.C. § 3553(a)(2)(B).**

The general need to deter future criminal conduct regarding the general public as a whole sits as the goal of 18 U.S.C. § 3553(a)(2)(B). *United States v Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). A prison sentence will do just that. The

question Mrs. Coyne posits, and one the Court must answer, is how long a prison sentence is necessary to accomplish this goal. As a mother, wife, and daughter, Mrs. Coyne asks that you sentence her to a minimal term of incarceration so that she can soon begin to repay the victim for the financial destruction she has caused him.

**d. To Protect the Public from Further Crimes of the Defendant. 18 U.S.C. § 3553(A)(2)(C).**

For the reasons set forth above, Mrs. Coyne reiterates that the Court should not feel compelled to sentence her to a lengthy term of imprisonment.

**e. To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner. 18 U.S.C. § 3553(a)(2)(D).**

Mrs. Coyne is an accomplished businesswoman. She is a devoted wife, mother, and daughter. There may be care or treatment within the Bureau of Prisons that could be of benefit to Mrs. Coyne. She asks that the Court use its best judgment at sentencing in determining what, if any, programs or training could benefit her in a meaningful way.

**5. Conclusion**

Mrs. Coyne understands what the advisory sentencing guidelines mean in her case. She understands and accepts that justice must be met and that the victim is entitled to the same. With the wide array of sentencing options available to the Court, Mrs. Coyne respectfully requests a sentence no higher than the lower one

third of the 51-63 guidelines range. Such a sentence will allow her to begin repaying the victim for her crime, care for her family, and provide for her community.

If the Court's sentence incudes a term of incarceration, Mrs. Coyne requests that she be allowed to self-surrender at a date and time set by the Bureau of Prisons.

Respectfully submitted,

CLARK HILL PLC

By: */s/ John D. Dakmak*

John D. Dakmak (P58210)
500 Woodward Avenue, Suite 3500
Detroit, Michigan 48226-3435
(313) 965-8300
jdakmak@clarkhill.com
Attorneys for Defendant

Date: September 15, 2026

**CERTIFICATE OF SERVICE**

I certify that on September 15, 2026, my assistant electronically filed the foregoing paper with the Clerk of the Court using the ECF System, which will send notification of such filing to all counsel listed.

I also certify that on September 15, 2026, my assistant emailed the foregoing document to Probation Officer Natalie Karpac.

*/s/ John D. Dakmak*
John D. Dakmak (P58210)
CLARK HILL PLC
500 Woodward Avenue, Suite 3500
Detroit, Michigan 48226-3435
(313) 965-8300
jdakmak@clarkhill.com
Attorneys for Defendant